[Cite as *State v. Barker*, 2026-Ohio-2633.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Appellee | : | C.A. No. 30482 |
| | : | |
| v. | : | Trial Court Case No. 2024 CR 01035 |
| | : | |
| DENIRO L. BARKER | : | (Criminal Appeal from Common Pleas Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY & OPINION** |
| | : | |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on July 10, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately send a copy of the court's ruling to each party and note that action on the docket. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
MICHAEL L. TUCKER, JUDGE

EPLEY, J., and HUFFMAN, J., concur.

OPINION

KIMBERLY KENDALL CORRAL, Attorney for Appellant
MICHAEL P. ALLEN, Attorney for Appellee


TUCKER, J.

{¶ 1} Defendant-appellant Deniro Barker appeals from his convictions of murder and having weapons while under disability. For the following reasons, we affirm.

## I. Factual and Procedural Background

{¶ 2} This case arises from the shooting death of A.T., which occurred outside of a Dayton bar known as Partner's Bar. Following an investigation, the police arrested Barker. On April 19, 2024, Barker was indicted on two counts of murder (proximate result) in violation of R.C. 2903.02(B), one count of felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2), one count of felonious assault (serious physical harm) in violation of R.C. 2903.11(A)(1), and one count of having weapons while under disability (prior offense of violence) in violation of R.C. 2923.13(A)(2). The murder and felonious assault charges carried three-year firearm specifications.

{¶ 3} Barker filed a motion seeking to suppress evidence from the search of his residence as well as photospread identifications made by two witnesses. Following a hearing, the trial court overruled the motion.

{¶ 4} A jury trial commenced on April 14, 2025.[1] At trial, the State presented evidence that the victim, A.T., and Charlene Tidwell went to the bar Brewski Barrel on the night of March 8, 2024. According to Tidwell, the couple was sitting at a table when A.T. stood up

---

1. Barker waived his right to a jury trial on the charge of having weapons while under disability.

and told a man standing close to him, later identified as Barker, to "back off." The two men began arguing. Eventually, the argument stopped, at which time Tidwell and A.T. left the bar. As they stepped outside, a silver sedan pulled up beside them, and the driver, Barker, began yelling at A.T. Before driving away, Barker threatened to kill A.T. Tidwell and A.T. then crossed the street to Partner's Bar, where Tidwell's car was parked. While walking, Tidwell and A.T. began to argue about the incident. A.T. said that he wanted to go home, and Tidwell agreed to take him. Prior to getting into her vehicle, Tidwell walked away for approximately two minutes in order to "cool down." As she returned to A.T.'s location, she heard yelling from inside the bar. She then saw Barker exit the bar and walk toward A.T. A.T. put his hands in the air, prompting Tidwell to run in the opposite direction. She turned back around, where she saw flashes of light and heard gunshots. A.T. fell to the ground and Barker ran away.

{¶ 5} The State presented evidence that Haley Barlow was at a different bar earlier that evening, where she observed an African American man whom she described as "nice looking" with high cheekbones and short braids. She took note of the man, later identified as Barker, because she thought he was attractive and believed that he was someone to whom her sister would be attracted. Barlow and her friends then went to the Brewski Barrel, where she again saw Barker as he argued with another man. After the argument ended, the two men walked away. Later, Barlow was outside of the bar, and she observed a silver sedan circle the parking lot before driving away. At some point later, she heard gunshots from across the street at Partner's Bar. She witnessed Barker outside of Partner's Bar holding a handgun. Barlow ran into Brewski Barrel and hid until police arrived at the scene.

{¶ 6} Both Tidwell and Barlow testified that they identified Barker from photographic arrays presented by the police. Although Tidwell admitted that she had indicated that she

was only 70% positive that the person she identified in the array was the shooter, she explained that her assessment had been affected by the array picture's depiction of Barker, who was smiling in the photo. She testified that she had not seen him smile during his encounters with A.T. and herself. However, both Tidwell and Barlow positively identified Barker during trial. Further, they both indicated that, prior to making their pretrial identifications, they had not seen any pictures of Barker on social media or the news.

{¶ 7} The State also presented evidence that Barker owned a silver sedan, which was recovered by police after the shooting. That sedan matched the descriptions provided by Tidwell and Barker and the images obtained from video footage pulled from surveillance cameras at the scene. The State presented evidence that Barker's cellphone was tracked and that it was located in the areas where the relevant events took place. The State presented the testimony of witnesses who placed Barker at both bars at the time of the offenses. Finally, the State presented evidence that an uncommon type of ammunition was used in the shooting and that a search warrant led to the discovery of that type of ammunition in Barker's residence.

{¶ 8} Following trial, the jury found Barker guilty on all counts and attendant specifications. The trial court found Barker guilty of having weapons while under disability. A sentencing hearing was conducted, during which the trial court merged all of the murder and felonious assault counts. The State elected to proceed on the first count of murder. The court sentenced Barker to an aggregate prison sentence of 24 years to life.

{¶ 9} Barker appeals.

## II. Failure to Object

{¶ 10} Initially, we note that each of Barker's first five assignments of error raises claims of ineffective assistance of counsel. Additionally, each of these five assignments of

4

error acknowledges that counsel's failure to object to various issues waives all but plain error regarding the assignments of error.

### A. Ineffective Assistance of Counsel

{¶ 11} We review alleged instances of ineffective assistance of counsel under the two-part analysis found in *Strickland v. Washington*, 466 U.S. 668 (1984), which the Ohio Supreme Court adopted in *State v. Bradley*, 42 Ohio St.3d 136 (1989). To prevail on an ineffective-assistance claim, a defendant must show that trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. *Strickland* at 687; *Bradley* at paragraph two of the syllabus.

{¶ 12} To establish deficient performance, the appellant must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Strickland* at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2005-Ohio-6143, ¶ 29 (2d Dist.), citing *Strickland*.

{¶ 13} To establish prejudice, the appellant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bradley* at 142, quoting *Strickland* at 694.

{¶ 14} Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *State v. Dunn*, 2024-Ohio-600, ¶ 19 (2d Dist.). "Debatable strategic and tactical decisions may not form the basis of a claim for

5

ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Hall*, 2021-Ohio-1894, ¶ 55 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524 (1992). We will not second-guess decisions of counsel that may be considered matters of strategy. *Id.*, citing *State v. Smith*, 17 Ohio St.3d 98 (1985).

## B. Plain Error

{¶ 15} "Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice." *State v. Bailey*, 2022-Ohio-4407, ¶ 8, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To prevail under this doctrine, a defendant must demonstrate an error that constitutes an "obvious" defect in the trial proceedings. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "However, even if the error is obvious, it must have affected substantial rights," meaning that the defendant must show a "reasonable *probability* that the error resulted in prejudice – the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis in original.) *Id.*, citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83 (2004).

## III. Confrontation Clause

{¶ 16} The first assignment of error states as follows:

THE ADMISSION OF PREJUDICIAL TESTIMONIAL HEARSAY EVIDENCE DENIED APPELLANT BARKER HIS SIXTH AMENDMENT RIGHT TO CONFRONT HIS ACUSER.

{¶ 17} Barker contends the trial court violated his Sixth Amendment right to confront his accusers when it permitted the State to "admit testimonial evidence through law enforcement 'obtaining information' from out of court declarants." Specifically, he argues that "[n]umerous officer's passively testified as to learning or obtaining the name of a suspect without offering the declarant who accused [Barker] or the basis of their accusation."

6

{¶ 18} The Confrontation Clause in the Sixth Amendment to the United States Constitution states, "[I]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This clause bars the "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). "The Sixth Amendment's Confrontation Clause applies only to testimonial statements and does not apply to nontestimonial statements." *Garfield Hts. v. Winbush*, 2010-Ohio-1658, ¶ 17 (8th Dist.), citing *State v. Siler*, 2007-Ohio-5637, ¶ 21.

{¶ 19} Barker cites *State v. Lewis*, 2007-Ohio-1485 (1st Dist.), as authority for his claim that his right to confront witnesses was violated. In that case, two detectives gave testimony at Lewis's trial during which they recounted statements they had made to Lewis during his police interview. Both detectives testified that they informed Lewis they had spoken to eyewitnesses who not only placed him at the scene of a murder but also claimed that Lewis had shot the victim. The witnesses were not named and were not subject to cross-examination at trial.

{¶ 20} In finding that this testimony was improperly admitted, the court of appeals stated, "[T]he threshold inquiry . . . is whether the challenged out-of-court statements . . . were testimonial in nature and needed to be tested by confrontation." *Id.* at ¶ 30. A statement is testimonial when it is "'made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."'" *Id.* at ¶ 31, quoting *State v. Stahl*, 2006-Ohio-5482, paragraph one of the syllabus, quoting *Crawford* at 52. The court concluded, "An objective witness would reasonably have concluded that statements that he or she had made to police detectives . . . identifying the perpetrators of a murder would have been available for use at a later trial, or would have

7

been used to establish or prove past events potentially relevant to later criminal prosecution. Indeed a statement made to the police 'that describes criminal activity is almost always testimonial.'" *Id.* at ¶ 40, quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

{¶ 21} Likewise, Barker contends that statements made by law enforcement officers during his trial should not have been admitted. He first objects to the testimony of Montgomery County Sheriff's Detective David Posma. Posma testified, "So it was eventually learned that day that [a] potential Facebook account with the name of Real Deniro had been ascertained." He also objects to the testimony of Dayton Police Detective Angela Woody that the police had "a first name and developed a date of birth." Barker next contests the statement by Dayton Police Officer Christopher White who, when asked whether he eventually learned the name of a suspect, answered affirmatively and stated "Deniro Barker." Finally, he objects to the testimony of Dayton Police Detective Melissa Schloss that Barker "became a person of interest for law enforcement." Barker argues that these "testimonial statements" make it clear "that law enforcement was informed by an unidentified person as to Deniro's first name and provided with his social media information as well as some information that police felt was sufficient to proceed with an investigation."

{¶ 22} The facts in this case simply do not raise a Confrontation Clause issue. Unlike the testimony in *Lewis*, none of the statements identified by Barker involve police recounting direct statements from any witnesses. Indeed, there is no indication that any of the statements to which Barker objects were the result of witness statements to the police. Moreover, as explained in *Lewis*, even if the officers' statements were based on statements made by a witness, "Ohio and federal courts have permitted the introduction of testimonial statements not subjected to prior confrontation where the testimony merely provided background information or a context for the investigation, explained a detective's conduct

8

while investigating a crime, gave meaning to the otherwise admissible responses of the defendants, or served solely to impeach a witness." *Lewis*, 2007-Ohio-1485, at ¶ 41 (1st Dist.).

{¶ 23} We find no error, plain or otherwise, and no showing that counsel was ineffective for failing to object to the officers' statements. Accordingly, the first assignment of error is overruled.

### IV. Claudia Tosto's Testimony

{¶ 24} The second assignment of error states:

THE APPELLANT'S SIXTH AMENDMENT CONFRONTATION RIGHTS WERE VIOLATED WHEN CLAUDIA TOSTO WAS PERMITTED TO TESTIFY THAT "THE BOYS TOLD HER THAT APPELLANT BARKER WAS A SUSPECT.

{¶ 25} Barker asserts that his right of confrontation was violated when Claudia Tosto was permitted to name him as a suspect in the shooting. According to Barker, when "Tosto was asked if she learned who was charged or who was a suspect, she testified that she followed up." Barker claims that the prosecutor then asked her, "And how do you know it was Deniro?" Tosto answered, "[T]he boys told me." Barker asserts he was denied the right to confront "the boys" regarding their identification of him as the suspect.

{¶ 26} The transcript of Tosto's testimony shows that she testified she was at Brewski Barrel on the night of the shooting with her boyfriend Devin Linton and their mutual friend, whom she only identified as "Joe." Tosto testified that Linton and Joe engaged in a conversation with another man, later identified as Barker. She testified that the three men knew each other from a skateboarding group. Tosto said that she left the three men and went outside to use her cellphone. At some point later, while she was still outside, she heard

9

gunshots from across the street at Partner's Bar. She did not see the shooting. Tosto testified that she called 911 and went to try to render help at the scene.

**{¶ 27}** A Confrontation Clause claim turns on whether the statement to which the defendant objects is testimonial in nature. That is, whether it was made with a reasonable belief that it would be used at trial. The Supreme Court of the United States has held that a statement is testimonial when its "primary purpose" is to "create an out-of-court substitute for trial testimony." *Ohio v. Clark*, 576 U.S. 237, 245 (2015). The Court further stated that such an inquiry requires consideration of "'all the relevant circumstances.'" *Id*. at 244, quoting *Michigan v. Bryant*, 562 U.S. 344, 369 (2011). Importantly, the court held that "[s]tatements to individuals who are not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than those given to law enforcement officers." *Id.* at 250.

**{¶ 28}** We disagree with Barker's characterization of Tosto's testimony. First, when Tosto was asked whether she learned the name of a suspect, Tosto testified, in direct contradiction to Barker's claim, that she tried not to follow up because she "tried to forget about" the incident. Additionally, the prosecutor did not ask Tosto how she knew that the suspect was Barker. Instead, the prosecutor asked her how she knew that the man with whom Linton and Joe had been conversing was Barker. Tosto then replied, "[T]he boys told me." A review of this testimony reveals that Tosto merely identified Barker as the man who was talking to Linton and Joe. She did not identify Barker as the shooter.

**{¶ 29}** From the totality of the testimony, we cannot conclude that Tosta recounted testimonial hearsay when she said that Linton and Joe had told her that the man with whom they had been speaking was Barker. This statement cannot reasonably be construed to be an out-of-court substitute for trial testimony, nor would have an objective witness believed

10

that the statement would be used at a later trial. Thus, we find no error, plain or otherwise, and no ineffective assistance of counsel regarding the introduction of this statement.

{¶ 30} The second assignment of error is overruled.

### V. In-Court Identifications

{¶ 31} Barker asserts the following for his third assignment of error:

BOEHMER FUGATE AND GOUGE-AGNGER'S IN COURT INDENTIFICATION PROCEDURE WAS UNDULY SUGGESTIVE, WAS IRREPERABLY INFLUENCED BY A SINGLE SOCIAL MEDIA PHOTO IDENTIFICATION, AND LACKED SUFFICIENT RELIABILITY FOR ADMISSIBILITY

{¶ 32} Barker claims that the in-court identifications made by three witnesses—Jessica Fugate, Sam Boehmer, and Zane Gouge-Agnger—who were in Partner's Bar at the time of the shooting were unreliable because they were unduly suggestive and influenced by pictures that were circulating on social media. Barker cites *Neil v. Biggers*, 409 U.S. 188, 196-197 (1972), for the proposition that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.*, citing *Simmons v. United States*, 390 U.S. 377, 384 (1968).

{¶ 33} We begin by noting that Fugate did not make any identification of Barker during her trial testimony. Thus, we can find no error regarding her testimony. Next, we note that neither Boehmer nor Gouge-Agnger identified Barker as the shooter either prior to or during trial. Indeed, both men testified that they heard the sound of gunfire but did not see the shooting. They merely testified that, moments before the shooting, they had taken note of

11

an African American male who had entered the bar looking for an unidentified individual. Both indicated the man was agitated or upset. Boehmer and Gouge-Agnger testified that they heard numerous gunshots less than one minute after the man exited the bar. They both identified Barker as the individual they saw. Boehmer and Gouge-Agnger also testified that, after the shooting, they saw a picture of the man on social media and/or the local news, which they recognized as the person they saw in the bar.

{¶ 34} As noted above, Barker relies on *Biggers* to support his claim that the exposure to social media and news images of him tainted the witnesses' in-court identifications. We disagree. *Biggers* involved action by the State. "'"The rationale for excluding a tainted pretrial identification is to protect the defendant from misconduct by the state."'" *State v. E.T.*, 2019-Ohio-1204, ¶ 47 (10th Dist.), quoting *State v. Gross*, 2002-Ohio-5524, ¶ 19, quoting *State v. Brown*, 38 Ohio St.3d 305, 310 (1988). "The Supreme Court of the United States has characterized confrontations unnecessarily suggestive of the suspect's guilt as those confrontations 'infected by improper police influence' resulting in a 'corrupting effect' on the identification process." *Id.* at ¶ 48, quoting *Perry v. New Hampshire*, 565 U.S. 228, 232, (2012). "'[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.'" (Bracketed text in original.) *Id.*, quoting *Perry* at 238-239, citing *Manson v. Brathwaite*, 432 U.S. 98, 107, 109 (1977).

{¶ 35} Here, there is no allegation of any State action concerning the identification testimony of Boehmer or Gouge-Agnger. There is no claim that either witness was shown a pre-trial photographic array of suspects or that they were asked to identify anyone in a show-up, line-up, or any other type of identification process conducted by law enforcement. We find no basis upon which trial counsel could have objected to the testimony by these

witnesses based on a due process violation. Given that no due process claim can be argued, the issue of whether the identifications were unreliable was a matter of credibility for the jury to determine. Counsel, appropriately, attempted to impeach the witnesses by suggesting that they were improperly influenced by social media and news images.

{¶ 36} We cannot find any error, let alone plain error, regarding the testimony of these witnesses. The third assignment of error is overruled.

### VI. Weapons Testimony

{¶ 37} The fourth assignment of error provides:

THE ADMISSION OF PREJUDICIAL IRRELEVANT WEAPONS TESTIMONY

WAS IMPROPER.

{¶ 38} Barker contends the trial court improperly admitted evidence that the police recovered numerous guns and ammunition during the execution of a search warrant at his residence. Barker argues that because none of the recovered items were implicated in the crime, they were irrelevant and should have been barred from admission. In support, he cites *State v. Thomas*, 2017-Ohio-8011.

{¶ 39} In *Thomas*, the trial court permitted the State to introduce evidence that the defendant had a collection of knives, which it referred to as "full Rambo combat knives." *Id.* at ¶ 45. None of the admitted knives were related to the knife used to stab the victim. *Id.* During closing argument, the prosecutor referred to the knives and held one up to the jury while intimating that it was similar to the murder weapon. *Id.* at ¶ 55 (Fischer, J., dissenting). The Ohio Supreme Court reversed the defendant's aggravated murder conviction, but only a plurality joined the opinion accompanying the judgment. *Id.* at ¶ 49. The plurality found that the defendant's knife collection was entirely unrelated to the charged crimes and concluded that it was presented by the State merely to show the defendant acted in

13

"conformity with a character trait for violence." *Id.* at ¶ 48. The opinion noted that such "propensity evidence" is not admissible under Ohio law. *Id.*; Evid.R. 404(B)(1). The plurality applied a plain error analysis, concluding that the unrelated weapons evidence was highly prejudicial and there was a reasonable probability that the inadmissible evidence affected the outcome of the trial. *Thomas* at ¶ 48.

{¶ 40} In this case, the State presented evidence that the ammunition used in the shooting was an unusual caliber and that the ammunition found during the search of Barker's residence was the same caliber. Further, the State introduced evidence that a rifle located during the search was capable of firing that type of ammunition but was ruled out as the murder weapon because the evidence demonstrated that a handgun, not a rifle, was used to shoot the victim. This evidence was relevant to the facts of this case. Thus, we cannot say that the admission of this evidence constituted improper propensity evidence.

{¶ 41} However, the remaining weapons evidence, under the rationale stated in *Thomas*, constituted improper other-weapons propensity evidence because there is no evidence in the record linking the guns to A.T.'s murder. As the opinion in *Thomas* noted, "Error in admitting other weapons evidence falls generally into one of two categories: harmless error or prejudicial error requiring reversal." *Thomas*, 2017-Ohio-8011, at ¶ 38. "Cases in which courts have deemed error in the admission of other weapons evidence to be harmless generally involved overwhelming independent evidence of guilt." *Id.* at ¶ 39. In other words, whether the alleged error was prejudicial to Barker depends on the strength and amount of independent evidence against him. In *Thomas*, the plurality found the error to be prejudicial because the evidence against the defendant was not overwhelming. *Id.* at ¶ 41.

14

{¶ 42} Given the substantial independent evidence supporting Barker's guilt, we are unable to reach the same conclusion as the *Thomas* plurality regarding the prejudicial effect of the other weapons evidence presented in this case. Specifically, numerous witnesses placed Barker in the location of the two bars. Two eyewitnesses identified him as the shooter. There was evidence that his vehicle matched the vehicle at the scene observed by witnesses and recorded by surveillance cameras. Barker's cellphone was determined to be in the area of the two bars at the time of the offense. Finally, the ammunition found at Barker's residence was the same caliber as that used to shoot A.T. Based on this record, we find that the error in the admission of the other weapons evidence constituted harmless error beyond a reasonable doubt.

{¶ 43} The fourth assignment of error is overruled.

### VII. Admission of Policy Body Camera Footage

{¶ 44} Barker's fifth assignment of error states:

THE ADMISSION OF A RECORDING OF OFFICER COOMER'S BODY CAM FOOTAGE WHCH HAD MINIMAL PROBATIVE VALUE, WAS CUMULATIVE TO THE VICTIM'S TESTIMONY, SERVED ONLY TO INFLAME THE JURY, AND IMPERMISSABLY BOLSTERED THE STATE'S WITNESS WAS VIOLATIVE OF APPELLANT BARKER'S RIGHTS.

{¶ 45} Barker contends the trial court erred by permitting "body cam footage taken by Officer [Colin] Coomer during his interview with the victim's paramore, Charlene Tisdale after she had just witnessed his shooting." Barker argues this evidence was introduced solely to bolster Tidwell's testimony and that it was "unfairly prejudicial and a needless presentation of cumulative evidence."

15

{¶ 46} The record demonstrates that Coomer was one of the first officers to arrive on the scene. Coomer testified that after the victim was removed from the scene, he interviewed Charlene Tidwell. Coomer testified that even though approximately ten minutes had elapsed between his arrival and the interview, Tidwell was emotional, upset, and "panicked." The State then asked to introduce approximately one minute of the interview footage retrieved from Coomer's body camera. Defense counsel asked to approach the bench, where he indicated that he wanted to determine the basis for the introduction of the footage which he noted constituted hearsay.[2]   In the video, Tidwell gave a quick description of the interactions between the victim and Barker as well as a description of Barker and his vehicle. The trial court admitted the footage under the excited utterance exception to the hearsay rule. Immediately after Coomer's testimony, the State presented Tidwell as a witness.

{¶ 47} We cannot say the trial court abused its discretion by permitting the introduction of the video footage in this case. Coomer's claim that Tidwell was upset and emotional is supported by the video. Therefore, we cannot fault the trial court for permitting its introduction under the excited utterance exception to the hearsay rule. While Barker correctly notes that the video footage was cumulative of Tidwell's testimony, we cannot conclude that the use of a one-minute video constitutes an abuse of discretion.

{¶ 48} We conclude the trial court did not abuse its discretion. The fifth assignment of error is overruled.

### VIII. Officer Christopher White's Testimony

{¶ 49} Barker's sixth assignment of error states:

THE TRIAL COURT ERRED IN ADMITTING IRRELEVENT OVERLY

---

2. Both parties claim counsel did not object to the introduction of this exhibit. From our review of the record, we conclude counsel's conduct arguably constituted an objection. Given this, we review this assignment of error under the abuse of discretion standard.

PREJUDICIAL LAW ENFORCEMENT "RECOGNITION" IDENTIFICATION TESTIMONY FROM UNDETERMINED PRIOR OCASSIONS OTHER THAN THE CRIME CHARGED.

{¶ 50} Barker claims he was unfairly prejudiced by the testimony of Dayton Police Officer Christopher White, who testified that he recognized Barker as someone he had previously seen at a bar known as the Shroyer Inn. Barker argues this testimony was irrelevant. He further claims that White's recognition testimony was premised on seeing a Facebook photograph of Barker, which constituted an "unduly suggestive single photo identification procedure."

{¶ 51} White testified that he was the first officer to respond to the scene of the shooting. Upon arrival, he immediately began chest compressions on the victim until he was relieved by another officer. After the victim was transported to the hospital, White began taking witness statements and taping off the scene. Sometime after the shooting, White saw a picture of Barker and noted that he recognized Barker as someone he had previously seen at the Shroyer Inn, which is located near Partner's Bar and Brewski Barrel.

{¶ 52} We first begin with the assertion that White's testimony that he recognized Barker after seeing a Facebook picture constituted an unduly suggestive photo identification procedure. There is nothing in the record to indicate that White saw a Facebook picture of Barker. Instead, the only testimony concerning the picture simply indicates that it was an image emailed to officers by a detective on the case. More importantly, this situation is not akin to a pre-trial identification where a witness is asked to identify a suspect from a photographic array, show-up lineup, or any other method of identification. Indeed, Barker had already been identified as a suspect when White observed the picture and noted that he recognized Barker from another bar.

**{¶ 53}** White's testimony simply indicated that he recognized Barker as someone who patronized the Shroyer Inn, and there was testimony from other witnesses that Barker was a regular patron at Brewski Barrel, Partner's Bar, and the Shroyer Inn. We agree that this testimony was relevant to the case.

**{¶ 54}** Moreover, we cannot conclude that White's testimony was overly prejudicial, especially because the trial court gave clear instructions to the jury that "[p]olice officers, as witnesses, are entitled to no more or less credibility simply because they are police officers," and jurors are presumed to follow the instructions provided by the court. *State v. Abdullahi*, 2024-Ohio-418, ¶ 37 (10th Dist.).

**{¶ 55}** The sixth assignment of error is overruled.

### IX. Suppression Hearing

**{¶ 56}** For his seventh assignment of error, Barker asserts the following:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT BARKER'S MOTION TO SUPPRESS IDENTIFICATION TESTIMONY OF BARLOW AND TISDALE.

**{¶ 57}** Barker contends that the trial court should have suppressed the pretrial photographic identification of him by Charlene Tidwell and Haley Barlow, who were eyewitnesses to the shooting. He argues that the procedure used by law enforcement was impermissibly suggestive so as to create a substantial likelihood of misidentification.

**{¶ 58}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. When ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "Consequently, an appellate court must accept the trial court's

18

findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist. 1997).

{¶ 59} On a motion to suppress identification testimony, "the accused bears the burden of showing that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' and that the identification itself was unreliable under the totality of the circumstances." *State v. Sherls*, 2002 WL 254144, *2 (2d Dist.), quoting *Biggers*, 409 U.S. at 199. "'A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection.'" *State v. Harmon*, 2017-Ohio-8106, ¶ 19 (2d Dist.), quoting *State v. Adams*, 2015-Ohio-3954, ¶ 208. "If the pretrial identification procedure was not unfairly suggestive, any remaining questions as to the identification's reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required." *Id.* at ¶ 19. In other words, "[a] determination of reliability is unnecessary . . . where an identification procedure was not unduly suggestive." *State v. Green*, 2003-Ohio-5744, ¶ 5 (2d Dist.). However, if "the defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure." *State v. Moody*, 2016-Ohio-8366, ¶ 12 (2d Dist.). Even if an identification procedure is suggestive, the subsequent identification is still admissible as long as it is reliable. *State v. McComb*, 2017-Ohio-4010, ¶ 32 (2d Dist.). "We review a trial court's refusal to suppress a

pretrial identification for an abuse of discretion." *Moody* at ¶ 14, citing *State v. Wilson*, 2009-Ohio-1038, ¶ 19 (2d Dist.).

{¶ 60} The following findings of fact, which were noted by the trial court in its decision denying the motion to suppress, are supported by the transcript of the suppression hearing. Detective Woody testified that she created the photographic arrays presented to Tidwell and Barlow. Woody is an experienced law enforcement officer who has created and presented more than 100 photospreads during her career. She testified that the Dayton Police Department utilizes both the OHLEG and JusticeWeb photospread systems to generate photographic arrays for presentation to witnesses. For this case, Woody used OHLEG, which had the most recent photograph of Barker.[3]

{¶ 61} According to Woody, based on the photograph of a suspect, OHLEG generates photographs of other individuals who fall within certain parameters regarding weight, height, age, race, hair color, and eye color. Woody also considered clothing, facial hair, hair style, and background color in an effort to create a fair array. For instance, she testified that Barker was smiling in his photograph, so she sought other individuals who were smiling. Once the photographs were selected, they were randomly shuffled in the separate arrays so that Barker was not in the same position in each one.

{¶ 62} In accordance with Dayton Police Department policy and R.C. 2933.83, blind administrators—officers not involved in this investigation and who did not know the identity of the suspect—were used to administer the presentation of the arrays to various witnesses, including Tidwell and Barlow. There is no allegation, nor any evidence in the record, to

_____

3. Woody testified that JusticeWeb featured a picture of Barker with a very distinctive hairstyle, which she thought would make him stand out in a photospread.

20

suggest that the blind administrators used any suggestive procedures while administering the identifications.

{¶ 63} This court has repeatedly held that the use of a computerized method of creating lineups, such as the one used in this case, "avoids most potential unfairness and almost any claim that the lineup was suggestive." *State v. Mitchell*, 2013-Ohio-3761, ¶ 15 (2d Dist.), quoting *State v. Carter*, 2006-Ohio-2823, ¶ 34 (2d Dist). Further, we have viewed the photographic arrays used in the identification of Barker and find nothing unduly suggestive about the set of photographs in the arrays. The six photographs contained in the array depict young African American males with roughly the same build and with very similar short hair styles. Nothing makes any one of the six stand out from the others, other than the fact that one male (not Barker) had much less of a smile than the other pictured males. Additionally, the record indicates that the police read the standard photographic array instructions to the witnesses, and that the witnesses did not speak to each other about the arrays during the interval between their two identifications of Barker. Therefore, we find nothing unduly suggestive about the identification process, and we need not address the issue of identification reliability.

{¶ 64} Upon review, we find that the trial court's findings of fact are supported by competent, credible evidence in the record. There is no support for Barker's claim that the photographic arrays or the methods used in their presentation were unduly suggestive. Thus, we cannot say the trial court abused its discretion in denying the motion to suppress the identifications made by Tidwell and Barlow.

{¶ 65} The seventh assignment of error is overruled.

21

## X. Cumulative Error

**{¶ 66}** Barker's eighth assignment of error provides:

THE CUMULATIVE EFFECT OF MULTIPLE ERRORS DEPRIVED APPELLANT OF HER CONSTITUTIONALLY GUARANTEED RIGHT TO A FAIR TRIAL UNDER THE FEDERAL AND STATE CONSTITUTIONS.

**{¶ 67}** Barker asserts the errors argued in his previous assignments of error, when considered together, denied him a fair trial.

**{¶ 68}** Under the doctrine of cumulative error, "[s]eparately harmless errors may violate a defendant's right to a fair trial when the errors are considered together. . . . In order to find cumulative error, we first must find that multiple errors were committed at trial." *State v. Harris*, 2004-Ohio-3570, ¶ 40 (2d Dist.). "A conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 2012-Ohio-2577, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus.

**{¶ 69}** Given our disposition of Barker's assignments of error and our conclusion that the record demonstrates only one error, we cannot conclude that he is entitled to relief under the cumulative error doctrine. The eighth assignment of error is overruled.

## XI. Conclusion

**{¶ 70}** All of Barker's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J., and HUFFMAN, J., concur.

22